IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| OMOWALE ASHANTI SHABAZZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:13-cv-00091 |
| | ) | |
| DERRICK SCHOFIELD, et al., | ) | Judge Sharp |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff Omowale Ashanti Shabazz, also known as Fred Dean, is presently incarcerated at the Northeast Correctional Complex ("NECX") in Mountain City, Tennessee. He brings this *pro se* action under 42 U.S.C. § 1983 for alleged violations of his constitutional rights, and under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. (ECF No. 1.) The plaintiff has submitted the filing fee of $350.00, but, because the plaintiff seeks redress from officers and employees of government entities, the plaintiff's complaint is before the Court for an initial review pursuant to 28 U.S.C. § 1915A(a) and 42 U.S.C. § 1997e.

## I.      STANDARD OF REVIEW

28 U.S.C. § 1915A(a) requires initial review of any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." Upon conducting this review, the district court must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint . . . is frivolous, malicious, or fails to state a claim upon which relief may be granted; or . . . seeks monetary relief from a defendant who is immune from such relief." *Id.* § 1915A(b). Similarly, 42 U.S.C. § 1997e(c) requires the dismissal of any action brought under § 1983 by a prisoner challenging his conditions of confinement "if the court is satisfied that the action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief." The Sixth Circuit has confirmed that the dismissal standard articulated by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), "governs dismissals for failure to state a claim under those statutes

because the relevant statutory language tracks the language in Rule 12(b)(6)." *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010). Thus, to survive scrutiny on initial review, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

In conducting the initial review, "a district court must (1) view the complaint in the light most favorable to the plaintiff and (2) take all well-pleaded factual allegations as true." *Tackett v. M & G Polymers, USA, LLC*, 561F.3d 478, 488 (6th Cir. 2009) (citing *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (citations omitted)). Although *pro se* pleadings are to be held to a less stringent standard than formal pleadings drafted by lawyers, *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *Jourdan v. Jabe*, 951 F.2d 108, 110 (6th Cir. 1991), the courts' "duty to be 'less stringent' with *pro se* complaints does not require us to conjure up [unpleaded] allegations." *McDonald v. Hall*, 610 F.2d 16, 19 (1st Cir. 1979) (citation omitted).

## II.    FACTUAL ALLEGATIONS

Shabazz names the following as defendants in this action: Derrick Schofield, Commissioner of the Tennessee Department of Correction ("TDOC"); Catherine Posey, TDOC Deputy Commissioner of Operations; Jim Thrasher, TDOC Assistant to the Commissioner; Reuben Hodge, TDOC Commissioner of Operations; Donna K. White, TDOC Director of Health Services; Lester Lewis, TDOC Medical Director of Clinical Services; Robert E. Cooper, Tennessee Attorney General; Eric Holder, United States Attorney General; David Osborne, [former] Warden of Morgan County Correctional Complex ("MCCX"); Ronald Higgs, MCCX Doctor; Dale Hadden, MCCX Nurse Practitioner; Tony Howerton, MCCX Warden; Correctional Medical Services, MCCX Contract Health Care Provider; Corizon, contract health-care provider at various TDOC facilities; Unnamed Health Administrator at MCCX; Jerry Lester, Warden of the Turney Center Industrial Complex ("TCIX"); Ricky Mathis, TCIX Deputy Warden; f/n/u Jenkins, TCIX Inmate Relations Coordinator; Laura Pierceal, TCIX Counselor; f/n/u Edwards, TCIX Unit Manager; David Sexton, Warden of the Northeast Correctional Complex ("NECX"); Todd Wiggins, NECX Deputy Warden; Sherry Freeman, NECX Health Administrator; Harold Angel, NECX Unit Manager; Roger Bailey, NECX

Chief of Security; NECX Cell Extraction Response Team ("CERT Team"); f/n/u Tressler or Tessler, NECX CERT Member; f/n/u Davis, NECX CERT Member; f/n/u Lundy, NECX CERT Member; f/n/u Gregg, NECX Correctional Officer; f/n/u Short, NECX Correctional Officer; Wanda Chafin, NECX Nurse Practitioner; f/n/u Cornet, NECX Medical Staff Person; f/n/u Jordan, NECX Medical Staff Person; f/n/u Shumate, NECX Medical Staff Person; and f/n/u Combs, NECX Medical Staff Person. The plaintiff states that all defendants are "sued in their individual capacity for monetary damages, and in their official capacity for declaratory and injunctive relief, where applicable." (ECF No. 1, at 1.)

### A. Claim Related to Enforcement of 28 U.S.C. § 1915(g)

The plaintiff initially sought to proceed *in forma pauperis* in this case, but, within a few days after the filing of the complaint, a family member submitted the $350.00 filing fee on his behalf. Nonetheless, the plaintiff alleges that two other relatively recent non-frivolous lawsuits filed by him were dismissed because he was unable to pay the filing fee. Based on the dismissal of these prior lawsuits, and the anticipated application of 28 U.S.C. § 1915(g) to this suit, the plaintiff asserts that § 1915(g) is unconstitutional insofar as it prevents him, solely on the basis of his poverty, from meaningful access to the courts.

### B. Allegations Regarding the Failure to Treat the Plaintiff's Hepatitis C

Shabazz has been incarcerated continuously since 1995, and was diagnosed with hepatitis C in approximately 2005. He claims he has never been given a liver biopsy but that he has all the known risk factors that contribute to the progression of hepatitis C, including that he is a male of "older age," with a long duration of infection and Genotype 1. (ECF No. 1, at 7.)

Beginning as early as 2008, he began filing requests that he be treated for this condition, and grievances related to the prison system's failure to provide adequate treatment. He alleges that, to date, he has never received treatment other than occasional monitoring and blood work. Since 2008, he has been transferred from Riverbend Maximum Security Institution ("RMSI"), to MCCX, then to TCIX, and most recently to NECX. The plaintiff apparently filed grievances related to the failure to provide treatment for hepatitis C at each of these facilities.

In 2008, while still at RMSI, he was assessed as having elevated liver enzymes. After the plaintiff filed grievances, the prison grievance board initially determined that he should receive treatment, but

TDOC's Commissioner and Director of Clinical Services disagreed. Before any action was taken, the plaintiff was transferred to MCCX.

The plaintiff began writing grievances at MCCX in August 2010, and was told by Nurse Practitioner Dale Hadden that there was no treatment available at MCCX for inmates with hepatitis C, because the prison did not have enough medical staff to properly monitor inmates taking the medication. Dr. Higgs, also at MCCX, responded to the plaintiff's grievance by stating that the plaintiff did not fit the criteria for hepatitis C treatment.

At the time, according to Shabazz, TDOC did not have in place any protocol or other guideline for assisting prison medical personal in evaluating inmates with hepatitis C for treatment. Likewise, the medical contractors engaged in providing medical care to inmates in TDOC custody, including Correctional Medical Services and Corizon, lacked any policy, protocol or other guideline to assist medical personnel in evaluating inmates with hepatitis C for treatment. Shabazz claims that, instead of having its own policy, TDOC has in place Policy No. 113.42, which establishes that the Centers for Disease Control, the National Institute for Health, and the Tennessee Department of Health possess the appropriate standards and guidelines to be followed for assessing and developing a treatment plan for inmates with hepatitis C. Shabazz claims that TDOC has not implemented these standards because it is more cost effective for TDOC simply not to treat inmates diagnosed with hepatitis C.

In October 2011, Shabazz filed a grievance with MCCX for failing to comply with Policy No. 113.42. It appears that this grievance was not finally resolved until June 2012, by which time the plaintiff had already been transferred to TCIX. The warden's ultimate response was that treatment was determined by Corizon, not TDOC.

Shabazz began filing grievances related to obtaining treatment for his hepatitis C virtually as soon as he arrived at TCIX. He alleges (and the attached exhibits document) that his grievances were actually resolved in his favor, and he was finally approved for treatment of his hepatitis C. He had either just begun receiving or was about to begin receiving treatment at TCIX based on a treatment plan, when he was abruptly transferred to NECX. He was initially told that after transfer his treatment plan would pick up where it left off.

The plaintiff alleges that since he has been at NECX, he has received one "chronic care" medical

visit with Nurse Chafin, but Chafin refused to discuss Shabazz's treatment plan with him. The plaintiff states that Nurse Chafin and Sherry Freeman, Health Administrator at NECX, have acted with deliberate indifference in failing to treat his hepatitis C, and that in delaying treatment they have "increased his risk of contracting a fatal liver disease, and ha[ve] placed plaintiff in imminent danger of serious physical injury." (ECF No. 1, at 12, Compl. ¶ 76.) The plaintiff alleges that Freeman, in her capacity as Health Administrator, failed to ensure proper training of medical staff at NECX for the treatment of a chronic condition, and that she is responsible for the fact that the treatment plan for hepatitis C finally developed for the plaintiff while he was at TCIX, was "completely abandoned once he arrived at NCEX." (Id. at 25–26, Compl. pt. VI.) The plaintiff alleges that he is still not receiving any form of treatment for his hepatitis C.

### C. Alleged Interference with Doctors' Orders

Shabazz alleges that in July 2012, while he was housed at TCIX, he was placed on the second floor of his housing unit. He alleges that "[t]he institutional warden, deputy warden, associate warden, unit manager, and their subordinates" (apparently including Warden Jerry Lester, Deputy Warden Ricky Mathis, Unit Manager Edwards, and perhaps Inmate Relations Coordinator Jenkins and Counsel Laura Pierceal), were all "deliberately indifferent" to his health and well-being based on their deliberate disregard for or interference with doctors' orders concerning the plaintiff's medical restrictions. (ECF No. 1, at 12.) More specifically, the plaintiff claims that, per doctors' orders, he was supposed to be housed in a bottom bunk in a first-floor unit and that he was not supposed to walk up stairs.

He claims this directive was violated when he and other inmates were ordered to pack up their cells and move to the recreation building for one night while their cells were painted. Besides this instance, the plaintiff alleges that he was "continually" placed in second floor cells and required to walk up and down stairs and hills. The plaintiff claims generally that he should never have been transferred to TCIX because the institution is built on hills and he was required to walk up hills and stairs to reach any destination. The plaintiff alleges that because of TDOC's and the institution's failure to create, implement and execute policies allowing inmates like him with mobility restrictions to be assigned inmate helpers or otherwise deal with the hills and stairs violated his constitutional rights and the ADA, and constituted deliberate indifference to his medical needs, resulting in "great pain every time he had to move from one

location to another, or one cell to another." (ECF No. 1, at 14.)

    **D.    Excessive Force and Denial of Medical Care at NECX**

Shabazz complains that at NECX he has been placed in a housing unit called the gang unit, even though Shabazz himself is not now and has never been a member of a gang. He complains that members of his unit, unit 7, are locked down in their cells most of the day. When he asked about it, the plaintiff was told by prison officials, including Deputy Warden Wiggins, that unit 7 is no longer a gang unit, but prison officials have failed to explain why the same punitive restrictions are in place in unit 7 as when it was a gang unit. Various NECX officials have told the plaintiff, in response to his grievances, that the unit will stay that way "until the TDOC Commissioner changes it." (ECF No. 1, at 16.)

The plaintiff also alleges that the NECX defendants have created "a hostile and dangerous living environment" in unit 7 by housing inmates at different custody levels within the same unit, including minimum custody inmates, who are subjected to the same "punitive sanctions" as everyone else on unit 7.

On September 26, 2012, the plaintiff was involved in an incident during which, he claims, members of the Cell Extraction Response ("CERT") Team were called to his unit in response to the plaintiff's refusal to comply with a correctional officer's direct order, even though the plaintiff claims he was not disrespectful and his actions were in compliance with prison policy. The plaintiff claims he was assaulted by Officer Lundy of the CERT Team without warning or provocation. Officer Lundy took the plaintiff back to his cell and then, once in the cell, continued his assault on the plaintiff, even though the plaintiff was not resisting or fighting back. Other CERT Team members arrived and began participating in the assault. The plaintiff has not been able to identify all the officers who were involved in the assault, but he alleges that the incident was captured on video tape. The plaintiff asserts that the assault amounted to the use of excessive force, with the intent to cause physical pain and suffering. He believes Officers Tressler (or Tessler) and Davis were two of the members involved.

The plaintiff also claims that officers Short and Gregg witnessed the assault upon the plaintiff but did not come to his aid or attempt to intervene.

The plaintiff was taken to unit 4, the segregation unit, where Captain Bailey told his subordinates to place the plaintiff in an upstairs cell. The plaintiff protested that he was under doctors' orders not to

walk up stairs. Captain Bailey told the plaintiff he would use a tazer on him if the plaintiff did not walk up the stairs, so the plaintiff went up the stairs.

Immediately after the alleged assault, the plaintiff was taken to the prison medical facility where he showed his bruises to Nurses Shumate and Cornet. The nurses took the plaintiff's pulse and temperature but did not conduct a complete physical examination to ascertain what injuries the plaintiff had suffered.

The plaintiff was moved out of segregation and to unit 14 the next day.

He saw Nurse Jordan on a sick call the second day after the assault, on September 28, 2012, still complaining about pain and bruising from the assault. Nurse Jordan did not conduct a physical examination. On October 1, 2012, the plaintiff put in a sick call to complain about injuries to his right shoulder, elbow, and hand. He spoke with Nurse Combs, who said she would not treat him because he was scheduled for a chronic care visit later in the month of October. The plaintiff complains that he is still suffering from pain and numbness in his right hand, but never received any medical attention for the injuries received during the assault on September 26, 2012.

The plaintiff saw Nurse Chafin for his chronic care visit in October 2012. Nurse Chafin, as discussed above, was allegedly rude and unresponsive. In addition to her refusal to discuss the plaintiff's hepatitis C treatment plan with him, she also refused to examine or treat the injuries he had received in the September 26 assault.

III. **LEGAL CLAIMS**

Based on these factual allegations, the plaintiff claims that the United States and Tennessee Attorneys General have and will continue to violate his equal-protection rights under the Fourteenth Amendment through the enforcement of 28 U.S.C. § 1915(g).

In addition, he asserts that the TDOC defendants, including Commissioner Schofield, Deputy Commissioner Posey, Assistant Commissioner Thrasher, Assistant Commissioner Hodge, Director White, and Director Lewis, as well as Wardens Osborne and Howerton, and the Health Administrator at MCCX, were all deliberately indifferent to the plaintiff's serious medical needs insofar as they failed to create, implement, or execute policies and procedures that would provide guidance to healthcare providers in the assessment and treatment, and continuity of care, for inmates with hepatitis C. The plaintiff claims that

these defendants' failure to create and implement such policies or procedures caused the plaintiff to be denied necessary medical care and treatment of his chronic and potentially fatal hepatitis C. The plaintiff also complains that the failure to implement policies and procedures for dealing with inmates with limited mobility resulting from chronic disease violated the ADA.

The plaintiff claims that Corizon, Corrections Medical Services, Dr. Ronald Higgs, and Nurse Practitioner Dale Hadden likewise failed to implement policies, procedures and protocols at MCCX to ensure that inmates with hepatitis C are promptly assessed and treated, and that as a result, the plaintiff was denied necessary medical care and was subjected to unnecessary pain and suffering, and increased risk of complications in connection with his hepatitis C. The plaintiff also alleges that these individuals' actions violated the ADA.

The plaintiff alleges that, at TICX, Warden Lester, Deputy Warden Mathis, Inmate Relations Coordinator Jenkins, Counselor Pierceal, and Unit Manager Edward failed to insure that the plaintiff's medical restrictions and limitations were accommodated, and continually directed that the plaintiff be housed in places that conflicted with medical orders in the plaintiff's TOMIS record, despite their knowledge of the plaintiff's medical limitations and restrictions. The plaintiff complains that these defendants failed to insure that policies and procedures were in place for insuring that inmates with medical restrictions are identified and accommodated. This failure directly resulted in the plaintiff's being inappropriately housed in a way that violated medical orders and caused him extreme pain and suffering.

At NECX, the plaintiff asserts that Nurses (or Nurse Practitioners) Shumate, Cornet, Jordan, Chafin and Combs all acted with deliberate indifference to the plaintiff's serious medical needs when they failed to examine him to ascertain the extent and nature of the injuries he received in the September 26 assault. He also contends that Chafin and Health Administrator Freeman specifically have been and continue to be deliberately indifferent to his serious medical needs by failing to continue the treatment plan for his hepatitis C that was started at TCIX. The plaintiff claims that these defendants' deliberate indifference violated his constitutional rights and also constituted negligence under state tort law.

With respect to Freeman, the plaintiff further alleges that this defendant has failed to insure that medical staff under her immediate supervision are adequately trained and supervised in the area of providing necessary treatment for inmates with chronic illnesses, which contributed to Nurse Chafin's

failure to provide adequate treatment for the plaintiff's hepatitis C.

The plaintiff further asserts that the administrative officials at NECX, including Warden Sexton, Deputy Warden Wiggins, and Unit Manager Angel have created a "hostile living environment" by placing inmates with different classifications and different custody levels into one housing unit, and subjecting all of them to punitive housing conditions without due process. The plaintiff insists that the housing of low and high security inmates together places him in "danger of serious bodily injury" in violation of the Eighth and Fourteenth Amendments. The plaintiff also appears to be attempting to state an equal-protection claim based on his being housed in unit 7, where the living conditions are substantially more restrictive than in other units at NECX with the same security classification.

The plaintiff alleges that defendants Gregg and Short witnessed his assault by CERT Team members but did nothing to stop it. The plaintiff claims this failure violated his "rights to be safe from unwarranted abuses from State actors." (ECF No. 1, at 26.)

The plaintiff also states that Warden Sexton and Commissioner Schofield have failed to implement policies or procedures allowing correctional officers who witness an unauthorized or illegal assault on an inmate to intervene, which caused or contributed to Officers Gregg and Short's failure to intervene in the assault on the plaintiff.

The plaintiff claims the CERT Team members themselves, including some whose names are yet unknown, intentionally and maliciously subjected him to the use of excessive force, in violation of his Eighth Amendment rights, and that these defendants are also liable for assault under state tort law.

The plaintiff complains that Officer Bailey's actions in forcing the plaintiff to violate the his medical restrictions by walking up a flight of stairs, even though Officer Bailey knew the plaintiff was not supposed to walk up stairs, constituted deliberate indifference to the plaintiff's physical well-being. The plaintiff also maintains that Bailey's actions amounted to punishment without due process in violation of the Fourteenth Amendment.

The plaintiff seeks various injunctive and declaratory relief, including an injunction providing for the plaintiff to begin receiving treatment for his hepatitis C, along with as well as compensatory and punitive damages and costs.

IV.     **ANALYSIS AND DISCUSSION**

The plaintiff seeks to bring claims under 42 U.S.C. § 1983 and under the ADA against numerous officials at TDOC and at the individual prisons where he has been housed in the past few years, as detailed above.  The Court must determine whether any of these claims survives initial scrutiny.

A.     **ADA Claims**

The plaintiff claims that various TDOC authorities failed to implement policies to insure that his medical restrictions and limitations were accommodated, and caused him to be "housed . . . in a way that would violate the Americans with Disabilities Act."  (ECF No. 1, at 28.)

Title II of the ADA prohibits public entities from *discriminating* against individuals on the basis of their disability.  *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 208 (1998).  Specifically, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  *Id.* § 12131(2).  The ADA defines "public entity" to include "any State or local government" and "any department, agency, . . . or other instrumentality of a State."  *Id.* § 12131(1).  The Supreme Court has expressly held that the term includes state prisons.  *United States v. Georgia*, 546 U.S. 151, 154 (2006); *Yeskey*, 524 U.S. at 210.

To state a claim under the ADA, a plaintiff must show that he is "(1) disabled under the statute, (2) 'otherwise qualified' for participation in the program, [services or activities in which he seeks to participate], and (3) being excluded from participation in, denied the benefits of, or subjected to discrimination under the program, [services, or activities] by reason of his or her disability."  *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 453 (6th Cir. 2008) (citation omitted).  In addition, a state agency like TDOC is not necessarily immune from a damages claim under the ADA, because Title II abrogates state sovereign immunity for claims based on "conduct that *actually* violates the Fourteenth Amendment."  *Georgia*, 546 U.S. at 159 (emphasis in original).

Assuming that the medical restrictions the plaintiff identifies in his complaint (inability to walk up or down stairs or hills "with any frequency," and limitations on lifting, standing, and bending, along with restrictions on other "major life functions" (ECF No. 1, at ¶ 85)) qualify him as having a disability under the ADA, the plaintiff does not allege that he has been discriminated against, or that he has been unable to participate in or receive the benefit of a service, program, or activity available to other inmates by reason of that disability, as is necessary to state a claim under the ADA. Instead, the plaintiff claims that the prisons where he has been housed failed to accommodate him by observing and implementing doctors' restrictions placed in his file, as a result of which he twisted his leg on one occasion while walking down a hill and was subjected to "daily pain and physical hardships," particularly when he was housed at TCIX. He does not identify any accommodations that he lacks in his current placement, nor does he make any allegations from which it may reasonably be inferred that the lack of accommodations for his disability has ever prevented him from accessing services, programs, or activities in the prison system. As a result, the plaintiff's allegations concerning the prison facilities' failure to accommodate his medical restrictions do not state a claim under the ADA. *Cf. Walls v. Garcia*, No. 1:12-cv-743, 2013 WL 227731, at *3 (W.D. Mich. Jan. 22, 2013) (dismissing ADA claims by partially blind inmate for failure to allege denial of access to programs). The ADA claims will therefore be dismissed.

**B.      Section 1983 Claims**

To state a claim under 42 U.S.C. § 1983, a plaintiff must "identify a right secured by the United States Constitution and deprivation of that right by a person acting under color of state law." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992); *West v. Atkins*, 487 U.S. 42, 48 (1988). Both parts of this two-part test must be satisfied to support a claim under § 1983. *Christy v. Randlett*, 932 F.2d 502, 504 (6th Cir. 1991).

### *1.      Claim Against the Attorneys General*

The plaintiff's first claim under § 1983 pertains to the prior dismissal of other complaints based on the application of § 1915(g), which he maintains is unconstitutional because it bars his access to the courts solely on the basis of his poverty. Shabazz states he seeks to sue the United States Attorney General Holder and Tennessee Attorney General Cooper because they are directly responsible for the enforcement of 28 U.S.C. § 1915(g) and Tennessee's equivalent statute.

The assertion that § 1915(g) is unconstitutional on equal-protection grounds is without merit. The Sixth Circuit has upheld the constitutionality of the "three-strikes" rule against arguments that it violates equal protection, the right of access to the courts, and due process, and that it constitutes a bill of attainder and is *ex post facto* legislation. *Wilson v. Yaklich*, 148 F.3d 596, 604–06 (6th Cir. 1998), *cert. denied*, 525 U.S. 1139 (1999). Because it is clear that the plaintiff fails to state a colorable claim against Attorney General Holder or Cooper based on the enforcement of § 1915(g), the claims against those defendants are subject to dismissal without further discussion. Moreover, this claim has been rendered moot by the plaintiff's submission of the filing fee.

### 2.    The Official-Capacity Claims Against State Officials

As regards most of his other claims under § 1983, the plaintiff clearly identifies a right secured by the Constitution—his right to be free from cruel and unusual punishment under the Eighth Amendment— and a violation of that right arising from various officials' alleged deliberate indifference to his serious medical needs, as discussed in more detail herein. In conducting the screening required by § 1915 and § 1915A, the Court must determine whether the plaintiff alleges sufficient facts respecting each defendant to state a colorable claim under § 1983 against that particular defendant.

In an action against a state officer acting in an official capacity, "the plaintiff seeks damages not from the individual officer, but from the entity for which the officer is an agent." *Pusey v. City of Youngstown*, 11 F.3d 652, 657 (6th Cir. 1993). Therefore, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

Generally, the Eleventh Amendment "bars all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments." *Thiokol Corp. v. Mich. Dep't of Treasury*, 987 F.2d 376, 381 (6th Cir. 1993). However, an exception set forth in *Ex parte Young*, 209 U.S. 123 (1908), allows for "actions against state officials sued in their official capacity for prospective injunctive or declaratory relief." *Thiokol*, 987 F.2d at 381. Suits for damages are not permitted against state officials, but "a federal court can issue prospective injunctive and declaratory relief compelling a state official to comply with federal law . . . [because] it is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507–08 (6th Cir. 2008) (emphasis added) (quotation marks and citations omitted). However, the *Ex parte*

*Young* exception does not extend to any retroactive relief. *Quern v. Jordan*, 440 U.S. 332, 338 (1979). Indeed, if a plaintiff's complaint against state officials is "based entirely on past acts and not continuing conduct that, if stopped, would provide a remedy to them, . . . it . . . does not come under the doctrine of *Ex parte Young*." *Gean v. Hattaway*, 330 F.3d 758, 776 (6th Cir. 2003).

In the present case, the *Ex parte Young* exception will permit official-capacity suits against the state official defendants insofar as the plaintiff requests prospective injunctive or declaratory relief. In addition, the Supreme Court has also confirmed that, although a state itself is not regarded as a "person" subject to liability under § 1983, "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) (quoting *Kentucky v. Graham*, 473 U.S. at 167 n.14 (1985)).

Based on these principles, the Court finds that the plaintiff has stated a claim under § 1983 for prospective injunctive relief against the state officials named as defendants in this action (including Derrick Schofield, TDOC Commissioner; Catherine Posey, TDOC Deputy Commissioner of Operations; Jim Thrasher, TDOC Assistant to the Commissioner; Reuben Hodge, TDOC Commissioner of Operations; Donna K. White, TDOC Director of Health Services; Lester Lewis, TDOC Medical Director of Clinical Services). The constitutional violation at issue here is the Eighth Amendment, which prohibits cruel and unusual punishment. Viewed in the light most favorable to the plaintiff, the complaint alleges that the Tennessee Department of Correction has failed to develop a coherent policy providing for the treatment of inmates in TDOC's custody who have hepatitis C. The result of this failure is a *de facto* custom at the institution level of not treating, or not adequately treating, inmates like the plaintiff with hepatitis C. The Sixth Circuit has stated that official-capacity liability requires the plaintiff to show that the state is a wrongdoer because of an "officially executed policy, or the toleration of a custom" that caused the constitutional violation. *Doe v. Claiborne Cnty.*, 103 F.3d 495, 507 (6th Cir. 1993). The allegations here are sufficient to meet that standard, and that plaintiff seeks injunctive relief based on the ongoing failure of TDOC to provide treatment to the plaintiff.

The plaintiff cannot bring a claim against the administrative officials at MCCX and TCIX in their official capacity for prospective injunctive relief, however, because the plaintiff is no longer housed at

either of those facilities and therefore cannot seek prospective injunctive relief regarding his treatment at those facilities.[2]   The plaintiff does not appear to seek prospective injunctive relief against the administrative officials at NECX regarding the failure to develop policies for the treatment of inmates with hepatitis C.  Even if he had done so, however, the claims would be essentially redundant of the claims against the TDOC officials.   The official-capacity claims against the authorities at MCCX, TCIX, and NECX will therefore be dismissed without prejudice.

### 3.   The Individual-Capacity Claims Against the State Officials

The plaintiff does not assert that any of the state officials had any direct personal involvement in the plaintiff's medical care at any of the facilities at which he has been incarcerated, but he claims that the officials knowingly tolerated a policy or practice of not treating chronically ill hepatitis C patients like the plaintiff, and the implementation of that policy led to the violation of the plaintiff's clearly established constitutional right under the Eighth Amendment to adequate medical care.

"Because § 1983 liability cannot be imposed under a theory of *respondeat superior*, proof of personal involvement is required for a supervisor to incur personal liability ."  *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005).  "At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate."  *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.), *cert. denied* 469 U.S. 845 (1984).  *See also Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 206 (6th Cir. 1998) ("[S]upervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act.  Instead, the liability must be based upon active unconstitutional behavior."  (citation omitted)).  Based on these principles, Sixth Circuit precedent permits a suit against state officials for their role in implementing or enforcing a policy in a way that deprives an individual of his constitutional rights.  *See Taylor v. Mich. Dep't of Corrs.*, 69 F.3d 76, 81 (6th Cir.1995) (finding a triable issue of fact as to a supervisor's liability where the supervisor was "charged with abandoning the specific duties of his position . . . in the face of actual knowledge of a breakdown in the proper workings of the department"); *Hill v. Marshall*, 962 F.2d 1209 (6th Cir. 1992) (finding that where a supervisory defendant "had a job to do, and he did not do it[,

---

[2]   The plaintiff lacks standing to assert the constitutional rights of other prisoners or to seek injunctive relief on behalf of anyone other than himself.  *Dodson v. Wilkinson*, 304 F. App'x 434, 438 (6th Cir. 2008).

and h]is failure to do his job resulted directly in a violation of the plaintiff's Eighth Amendment right").

The plaintiff alleges, in essence, that the TDOC officials named as defendants were responsible for developing and implementing a coherent policy for the treatment of TDOC inmates with hepatitis C, and that in failing to implement the policy in a way that provided for guidance at the institution level for the treatment of the plaintiff, they are directly liable under § 1983. The Court finds that the allegations in the complaint give rise to an inference that the state defendants had a duty to develop such a policy and that they willfully tolerated a custom or implied policy of non-action that they knew would create a substantial risk of harm to the class of persons, like the plaintiff, with hepatitis C. Although it is not at all clear that the plaintiff can succeed on these claims, the Court finds that they survive initial scrutiny.

**4.** *The MCCX Defendants*

The MCCX defendants include former Warden David Osborne; current Warden Tony Howerton; Dr. Ronald Higgs; Nurse Practitioner Dale Hadden; Correctional Medical Services; Corizon; and an unnamed "Health Administrator."

The plaintiff alleges that Nurse Practitioner Hadden and Dr. Higgs were aware of and refused to treat his hepatitis C. In addition, the plaintiff states that Hadden initially told him that she could not provide treatment to him because there was no sufficient medical staff at MCCX to monitor inmates taking the medication. In order to state an Eighth Amendment violation, a prisoner must "allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The deliberate-indifference requirement is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (citing *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004). "The failure to address a serious medical need rises to the level of a constitutional violation where both objective and subjective requirements are met." *McCarthy v. Place*, 313 F. App'x 810, 814 (6th Cir. 2008). "The objective component requires an inmate to show that the alleged deprivation is 'sufficiently serious'" and "'that he is incarcerated under conditions posing a substantial risk of serious harm.'" *Brown*

*v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (quoting *Farmer*, 511 U.S. at 834). "To satisfy the subjective component, an inmate must show that prison officials had 'a sufficiently culpable state of mind.'" *Id.*

While the law is clear that the mere existence of a hepatitis C infection is not necessarily a "serious medical need" warranting treatment, such that the failure to provide treatment automatically violates the Eighth Amendment, *see Hix v. Tenn. Dep't of Corr.*, 196 F. App'x 350, 357 n.1 (6th Cir. 2006) (recognizing that "hepatitis C does not require treatment in all cases"), the plaintiff's allegations in his complaint are, for purposes of the Court's initial screening, sufficient to state a claim against Hadden and Higgs under the Eighth Amendment based on their alleged deliberate indifference to the plaintiff's serious medical needs.

The plaintiff also alleges that, at the time, neither MCCX nor the healthcare contractors who do or did provide medical services to inmates at MCCX at that time, Corizon and Correctional Medical Services, had a policy or protocol for assisting the medical staff in evaluating inmates with hepatitis C for treatment, and that they had an affirmative duty to develop such policy or protocol. Further, the plaintiff alleges that, to the extent that TDOC itself might have had a policy concerning the treatment of inmates with hepatitis C, the prison and medical officials at MCCX made a conscious decision, motivated by financial considerations, not to implement the policy.

Based on these allegations, the Court finds that the plaintiff has stated a claim against the MCCX administrators and healthcare personnel in their individual capacity, as well as against Corizon and Correctional Medical Services. *See Taylor*, 69 F.3d at 81 (noting that a § 1983 suit may be maintained against state officials for their role in implementing or enforcing a policy in a way that deprives an individual of his constitutional rights); *Hill*, 962 F.2d at 1213 (noting that such claims are appropriate where individual officials are charged with "abandoning the specific duties of [their] position[s] . . . in the face of actual knowledge of a breakdown in the proper workings" of their respective departments or facilities). The plaintiff will be permitted to take discovery to ascertain the identity of the Health Administrator at MCCX.

### 5. *The TCIX Defendants*

The TCIX personnel named as defendants are Warden Jerry Lester, Deputy Warden Ricky

Mathis, Inmate Relations Coordinator Jenkins; Counselor Laura Pierceal, and Unit Manager Edwards. The plaintiff's claims against these individuals is apparently not related to the denial of treatment for hepatitis C, because he was ultimately approved to begin receiving treatment at TCIX (but then was transferred to NECX). Rather, his claims are based on the alleged failure of various TCIX personnel to accommodate his medical restrictions, including by ensuring that he was housed in a first floor cell and assigned a bottom bunk, and this failure constituted deliberate indifference to the plaintiff's serious medical needs. The plaintiff claims that TCIX "continually placed the plaintiff in second floor cells" (ECF No. 1, at ¶ 86), and on one occasion required him to pack up his cell and move out for one night while his cell was being painted, even though the was medically restricted from lifting over a certain amount of weight and from walking up and down stairs and hills.

The plaintiff asserts that the "warden, deputy warden, associate warden [who is not named as a defendant], unit manager and their subordinates [were] deliberately indifferent to the plaintiff's health and well-being for interfe[r]ing with or disregarding the doctors orders concerning plaintiff's medical restrictions." (ECF No. 1, at ¶ 78.) He specifically alleges that Inmate Relations Coordinator Jenkins ignored the medical restrictions, even after the plaintiff made him aware of them, and refused to assign the plaintiff to a bottom bunk in a first-floor cell. He faults the warden and deputy warden as well as TDOC authorities for failing to implement policies that would prevent inmates with restrictions like his from being placed at TCIX, and alternatively for not implementing policies for accommodating inmates with physical restrictions.[3] The plaintiff alleges that, as a result, he was subjected to "daily pain and physical hardships" throughout his placement at TCIX.

The Court finds that the plaintiff states an arguably colorable claim under § 1983 against Jenkins based on his alleged personal involvement in refusing to accommodate the plaintiff's medical restrictions, thereby acting with deliberate indifference to the plaintiff's serious medical needs.

With respect to the supervisory personnel, the plaintiff's primary complaint appears to be that these individuals denied his grievances on this issue, which is generally insufficient to establish liability under § 1983. *Grinter v. Knight*, 532 F.3d 567, 576 (6th Cir. 2008) ("The 'denial of administrative

---

[3] The plaintiff complains—and filed a grievance—about twisting his leg while walking down a hill to the dining facility. This type of accident could happen to any person, and the fact that it happened on one occasion to the plaintiff does not give rise to the inference of a constitutional violation.

grievances or the failure to act' by prison officials does not subject supervisors to liability under § 1983." (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). In addition, however, the plaintiff asserts that the continued and repeated failure to accommodate his restrictions was the result of a failure to implement a policy, and that the supervisors' failure to act to implement a policy itself amounted to deliberate indifference. For the same reasons cited above, the Court finds that the plaintiff has stated a claim against the supervisory MCCX employees (Lester, Mathis, Pierceall and Edwards) in their individual capacity, based on their alleged active failure to implement an appropriate policy. *See Taylor*, 69 F.3d at 81 (noting that a § 1983 suit may be maintained against state officials for their role in implementing or enforcing a policy in a way that deprives an individual of his constitutional rights); *Hill*, 962 F.2d at 1213 (noting that such claims are appropriate where individual officials are charged with "abandoning the specific duties of [their] position[s] . . . in the face of actual knowledge of a breakdown in the proper workings" of their respective departments or facilities).

### 6.    *The NECX Defendants*

#### a.    *Failure to Treat Hepatitis C*

For the same reasons discussed above in connection with the failure-to-treat claims against other prison medical staff, the Court finds that the plaintiff has stated an Eighth-Amendment claim against Nurse Chafin and Health Administrator Freeman under § 1983 for deliberate indifference to the plaintiff's serious medical needs, as a result of their alleged failure to provide the plaintiff with treatment for his hepatitis C, and specifically for failing to continue the treatment plan previously established when the plaintiff was still at TCIX.

#### b.    *The Use of Excessive Force*

The Eighth Amendment proscribes the "unnecessary and wanton infliction of pain" on prisoners. *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (citing *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). The "core judicial inquiry" in determining whether a prison official's alleged conduct constitutes excessive force in violation of the Eighth Amendment is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, - - -, 130 S. Ct. 1175, 1178 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always

are violated . . . whether or not significant injury is evident." *Hudson*, 503 U.S. at 9. Notwithstanding, the Eighth Amendment's "prohibition of 'cruel and unusual punishments' necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Id.* at 9–10 (quoting *Whitley*, 475 U.S. at 327 ).

Here, the plaintiff alleges that he was subjected to the use of excessive force, deliberately and intentionally, by Officer Lundy of the CERT Team and other CERT Team members, including Davis and Tressler or Tessler. The plaintiff also names the CERT Team itself as a defendant. The plaintiff alleges that he suffered bruising, a cut on his head, and other injuries as a result of the assault, and that he continues to suffer pain and numbness in his right hand. For purposes of the initial review under § 1915(e), the Court finds that these injuries are sufficiently serious to state a claim under the Eighth Amendment. *Cf. Hudson*, 503 U.S. at 10 (finding that "bruises, swelling, loosened teeth, and a cracked dental plate, [were] not *de minimis* for Eighth Amendment purposes). The plaintiff states a colorable claim for violation of the Eighth Amendment against Lundy, Tressler/Tessler, and Davis. He will be permitted to conduct discovery to ascertain the identity of the other CERT Team members who might have been involved in the attack, if any. However, the plaintiff does not allege that an action by the CERT Team as a unit gave rise to his claim; rather, he claims that individual members of the CERT Team participated in the allegedly unconstitutional assault. The claim against the CERT Team *per se* will therefore be dismissed for failure to state a claim.

The plaintiff alleges that Officers Short and Gregg stood by and witnessed the attack by the CERT Team members without intervening or taking any steps to stop the assault. Properly speaking, the claim against Short and Gregg is not an excessive-force claim, but a failure-to-protect claim. *Cf. Carico v. Benton*, 58 F. App'x 632, 637 (6th Cir. 2003). In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court discussed prison officials' duty under the Eighth Amendment to protect prisoners and provide humane conditions of confinement. *Id.* at 832–33. There, the Court held:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837. The Court further emphasized that "[a] prison official's duty under the Eighth Amendment is to

ensure 'reasonable safety.'" *Id.* at 844 (quoting *Helling v. McKinney*, 509 U.S. 25, 33 (1993)). Thus, "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Id.* at 845. On the other hand, a prison official who is aware of a "substantial risk" to an inmate's safety but fails to take steps to avert it may be liable under the Eighth Amendment. *Id.* at 847. Even before the Court issued its opinion in *Farmer*, the Sixth Circuit had held that a prison official has "a duty to try and stop another officer who summarily punishes a person in the first officer's presence," and therefore that a "correctional officer who observes an unlawful beating may . . . be held liable under § 1983 without actively participating in the unlawful beating." *McHenry v. Chadwick*, 896 F.2d 184, 188 (6th Cir. 1990).

The plaintiff's allegations regarding what exactly Gregg and Short witnessed are not detailed. If these officers only witnessed Officer Lundy place the plaintiff in handcuffs and walk him back to his cell, they may not have witnessed an assault that amounted to the use of excessive force, or they may not have been in a position to intervene. However, if they were also able to witness the alleged assault that took place inside the plaintiff's cell, and could have but failed to intervene, they may be liable under § 1983. Giving the plaintiff the benefit of the doubt, as is appropriate at this stage in the proceedings, the Court finds that the plaintiff states a claim under § 1983 against officers Gregg and Short based on a purported failure to protect him from assault by other officers.

The plaintiff alleges that Captain Bailey engaged in cruel and unusual punishment when he directed that the plaintiff be placed in an upstairs cell in the segregation unit, and forced the plaintiff to walk up the stairs to that cell even after the plaintiff tried to explain that he was medically restricted from using stairs. The plaintiff does not allege that he was unable to walk up the stairs, or that walking up one flight of stairs exacerbated his medical condition. The court finds that this isolated event, which inflicted *de minimis* injury, if any, does not rise to the level of a constitutional violation. *See Hudson*, 503 U.S. at 9–10 (a *de minimis* use of physical force will not support an Eighth Amendment claim unless the force used is "of a sort repugnant to the conscience of mankind"). The complaint fails to state a claim against Captain Bailey.

Finally, the plaintiff alleges that Warden Sexton and the Deputy Commissioner of Operations concurred in the denial of the grievances related to this event. As stated above, the denial of a grievance,

standing alone, does not provide a basis for liability under § 1983. *Grinter v. Knight*, 532 F.3d 567, 576 (6th Cir. 2008) ("The 'denial of administrative grievances or the failure to act' by prison officials does not subject supervisors to liability under § 1983." (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). The Court therefore finds that the complaint fails to state a claim against Warden Sexton or the Deputy Commissioner of Operations in their individual capacity based on their denial of grievances related to the use of excessive force by other prison officials.

### c.      The Failure to Treat Injuries

A constitutional claim for deliberate indifference to serious medical needs requires a showing of both an objective and subjective component. The objective component requires a plaintiff to show the existence of a "sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A medical need is sufficiently "serious" if the failure to treat a prisoner's condition could result in further significant injury or the "wanton infliction of unnecessary pain." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). The subjective component requires a plaintiff to "allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837). Although the subjective standard "is meant to prevent the constitutionalization of medical malpractice claims," a plaintiff need not show that the officer acted with the specific intent to cause harm. *Id.* Rather, "'deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.'" *Id.* (quoting *Farmer*, 511 U.S. at 836). Because prison officials are not likely to readily admit this subjective component, "it [is] permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge." *Id.*

The plaintiff alleges that Nurses Shumate and Cornet took his temperature and pulse rate after the assault by the CERT Team members. The plaintiff showed the nurses his bruises and the cut on his head, but they never performed a full physical examination to assess what other injuries he might have sustained as a result of the assault. Based on these allegations, the Court finds that the plaintiff has not stated a claim against Shumate and Cornet for deliberate indifference to the plaintiff's serious medical needs, since they performed at least a perfunctory examination and apparently did not perceive that the

plaintiff had any serious injuries. Further, the plaintiff's allegations do not suggest that they had any reason to suspect that the plaintiff had any injuries beyond a cut and a few bruises. Similarly, the plaintiff complained to Nurse Jordan the next day to ask for new cane (because his cane was broken by a CERT Team member). He showed Nurse Jordan his injuries, but she did not perform a complete physical examination either. The plaintiff, however, has not alleged any facts giving rise to an inference that Nurse Jordan had any reason to suspect that the plaintiff had injuries in addition to the bruises he showed her.

A few days later, the plaintiff went back to sick call, complaining of continued pain in his right shoulder, elbow and hand. Nurse Comb refused to treat him then, because he was scheduled for a chronic-care visit later the same month. Based on the plaintiff's allegations, it appears that Nurse Comb had reason to believe by this point that the plaintiff might have suffered orthopedic injuries beyond a few bruises, and that the failure to examine or treat them might result in exacerbation of the injury and additional substantial pain. Moreover, the fact that the plaintiff had a chronic-care visit later in the month, supposedly to address his hepatitis C, would not necessarily excuse ignoring the plaintiff's request for treatment of his more immediate injuries. Again giving the plaintiff the benefit of the doubt, the Court will permit the plaintiff's deliberate-indifference claim against Nurse Comb to proceed.

d. *"Hostile Living Environment"*

The plaintiff alleges that Warden Sexton, Deputy Warden Wiggins, and Unit Manager Harold Angel have created a "hostile living environment" in unit 7, where the plaintiff was housed. The plaintiff alleges that housing together inmates with different classifications and custody levels and subjecting them to "punitive sanctions" amounts to a deprivation of due process, and that it placed the plaintiff in danger of serious bodily injury, in violation of the Eighth and Fourteenth Amendments. The plaintiff does not allege that he suffered serious injury while he was placed in unit 7, and it is not clear whether the plaintiff remains housed in unit 7.

The plaintiff fails to state a claim under the Eighth Amendment based on the alleged threat of injury that never occurred. Moreover, the alleged "punitive sanctions" are not sufficiently egregious to state a claim under the Eighth Amendment for cruel and unusual punishment.

Nor has the plaintiff stated a claim based on violation of his due-process rights under the Fourteenth Amendment. The Due Process Clause of the Fourteenth Amendment provides that no state

"shall deprive any person of life, liberty, or property without due process of law." U.S.C.A. Const. Amend. 14. Thus, the Constitution is implicated only if a person is deprived of an interest protected by the Due Process Clause. The Supreme Court long has held that the Due Process Clause does not protect every change in the conditions of confinement having an impact on a prisoner. *See Meachum v. Fano*, 427 U.S. 215, 225 (1976). In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Court set forth the standard for determining when a state-created right creates a federally cognizable liberty interest protected by the Due Process Clause. According to the holding in *Sandin*, a prisoner is entitled to the protections of due process only when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. Without a protected liberty interest, a prisoner-plaintiff cannot successfully claim that his due process rights were violated, because "[p]rocess is not an end in itself." *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983).

In *Sandin*, the Supreme Court specifically held that a prisoner does not have a protected liberty interest in the procedures affecting his classification and security because the resulting restraint does not impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. *See also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998) (noting that "administrative segregations have repeatedly been held not to involve an 'atypical and significant' hardship implicating a protected liberty interest without regard to duration"); *Rimmer–Bey v. Brown*, 62 F.3d 789, 790–91 (6th Cir. 1995) (likewise holding that a prisoner's placement in administrative segregation was not an atypical and significant hardship). Moreover, the Court repeatedly has held that a prisoner has no constitutional right to be incarcerated in a particular facility or to be held in a specific security classification. *See Olim*, 461 U.S. at 245; *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *Meachum*, 427 U.S. at 228–29.

Because the plaintiff has no due-process right to a particular security classification, he also has no right to be housed with other inmates who are at a specific security classification. Moreover, the alleged conditions of detention in unit 7 do not impose an "atypical and significant hardship" of the type required to state a due-process claim. *Cf. Harbin-Bey v. Rutter*, 420 F.3d 571, 577 (6th Cir. 2005) (finding a prisoner's increase in security classification because of his designation as a member of a security threat group failed to state a due process claim "because a prisoner has no constitutional right to

a specific security classification"); *Cash v. Reno*, No. 97-5220, 1997 WL 809982, *2 (6th Cir. Dec. 23, 1997) (prisoner's allegation that he was placed in a security level higher than warranted based on the information contained in his prison file failed to state a due process claim because he had no constitutional right to be held in a particular prison or security classification); *O'Quinn v. Brown*, No. 92-2183, 1993 WL 80292, *1 (6th Cir. March 22, 1993) (prisoner failed to state a due process or equal protection claim regarding his label as a "homosexual predator" because he did not have a constitutional right to a particular security level or place of confinement).

<i>e.    Equal-Protection Claim</i>

The plaintiff also appears to be attempting to state an equal-protection claim based on his being housed in unit 7, supposedly a gang unit with more restrictive conditions of confinement than other units at NECX.  The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike.  U.S. Const., amend. XIV; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  A state practice generally will not require strict scrutiny unless it interferes with a fundamental right or discriminates against a suspect class of individuals.  *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976).  Although the plaintiff alleges that a disproportionate number of African-Americans are in the "gang unit," he does not actually allege that his treatment is based on his race, and does not otherwise allege that he is a member of a suspect class.  It is beyond question that "prisoners are not considered a suspect class for purposes of equal protection litigation." *Jackson v. Jamrog*, 411 F.3d 615, 619 (6th Cir. 2005); *see also Wilson v. Yaklich*, 148 F.3d 596, 604 (6th Cir. 1998).

Because neither a fundamental right nor a suspect class is at issue, the rational-basis standard of review applies.  *Davis v. Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir. 2012).  Under rational basis scrutiny, government action amounts to a constitutional violation only if it "is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational."  *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005).  To prove an equal-protection claim, a plaintiff must demonstrate "intentional and arbitrary discrimination" by the state; that is, he must demonstrate that he "has been intentionally treated differently from others

similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

The plaintiff alleges that he has been told by prison officials that unit 7 is no longer the gang unit. The plaintiff further asserts, however, that the same restrictions that were in place when the unit was a gang unit remain in place, and that, for instance, medium security inmates in unit 7 (such as the plaintiff) are treated differently than medium security inmates housed in other units. More specifically, the plaintiff states that because he and other medium-security inmates, because they are housed in unit 7, have reduced recreation time and restricted access to the telephone and visitation compared to other medium-security inmates; they are not allowed to participate in hobby shop, bands, card games or any other non-religious activities; they are fed separately from the general population; and they are required to remain in their assigned cell except during showers, phone calls or "conducting legitimate business with staff." (*See* ECF 1-1, at 41.) Medium-security inmates housed in other units at NECX are not subject to the same restrictions. The complaint may be construed to imply that there is no rational basis for the distinctions between the conditions in unit 7 and the other units at the prison. Based on these allegations, the Court finds that the plaintiff has stated an equal-protection claim against the prison authorities charged with forming and implementing housing policies at the prison, including Warden Sexton, Deputy Warden Wiggins, and Unit Manager Angel. These claims will be permitted to proceed.

## V.    CONCLUSION

For the reasons set forth herein, in conducting the initial review required by statute, the Court finds that the complaint states colorable claims under § 1983 against twenty-nine of the thirty-six defendants (plus unnamed CERT Team members), including Derrick Schofield, Catherine Posey, Jim Thrasher, Reuben Hodge, Donna K. White, Lester Lewis, David Osborne, Ronald Higgs, Dale Hadden, Tony Howerton, Correctional Medical Services, Corizon, Unnamed MCCX Health Administrator, Jerry Lester, Ricky Mathis, f/n/u Jenkins, Laura Pierceal, f/n/u Edwards, David Sexton, Todd Wiggins, Sherry Freeman, Harold Angel, f/n/u Tressler or Tessler, f/n/u Davis, f/n/u Lundy, f/n/u Gregg, f/n/u Short, Wanda Chafin, and f/n/u Combs. The § 1983 claims against those defendants will, for now, be permitted to proceed. The plaintiff's § 1983 claims against Tennessee Attorney General Robert Cooper, United States Attorney General Eric Holder, the CERT Team at NECX, Captain Roger Bailey, and NECX Medical Staff

members Shumate, Cornet, and Jordan will be dismissed for failure to state a claim for which relief may be granted.  All purported claims under the ADA will be dismissed for failure to state a claim.

The official-capacity claims against the supervisory defendants at MCCX, TCIX, and NECX will be dismissed without prejudice on the basis that they are redundant of the official-capacity claims against the TDOC officials.

An appropriate order is filed herewith.


Kevin H. Sharp
United States District Judge